UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| RONALD LIGHTELL | * | CIVIL DOCKET NO: |
| | * | 20-cv-672 |
| VERSUS | * | |
| | * | |
| TIM WALKER, INDIVIDUALLY AND IN HIS | * | |
| OFFICIAL CAPACITY AS THE CHIEF OF THE | * | JUDGE |
| HARAHAN POLICE DEPARTMENT; KEITH | * | |
| MOODY, INDIVIDUALLY AND IN HIS OFFICIAL | * | |
| CAPACITY AS THE ASSISTANT CHIEF OF THE | * | |
| HARAHAN POLICE DEPARTMENT; MANUEL | * | MAG. |
| ADAMS INDIVIDUALLY AND IN HIS OFFICIAL | * | |
| CAPACITY AS A CAPTAIN IN THE HARAHAN | * | |
| POLICE DEPARTMENT; THOMAS BRONK | * | |
| INDIVIDUALLY AND IN HIS OFFICIAL | * | |
| CAPACITY AS A LIEUTENANT IN THE | * | |
| HARAHAN POLICE DEPARTMENT; AND THE | * | |
| CITY OF HARAHAN | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

## COMPLAINT

NOW INTO COURT, through undersigned counsel, comes the Plaintiff, Ronald Lightell, who files this Complaint for violation of his constitutional and statutory rights.  As shown below, Plaintiff Lightell, who is a commissioned police officer and a Civil Service employee, had a constitutionally protected property interest in his job as a Police Sergeant at the Harahan Police Department.  However, the Defendants herein undertook a campaign of harassment against the Plaintiff involving repeated false disciplinary actions against him, constant questions, unreasonable demands, surveillance of his actions, and efforts to undermine his authority with the officers he supervised.  Eventually, the Defendants' actions made conditions so intolerable for the Plaintiff and posed such a threat to his career in law enforcement that he was forced to resign from his position at the HPD.  The Defendants' actions amounted to a constructive

discharge of the Plaintiff from his job as Harahan Police Sergeant, in violation of his rights under the U.S. Constitution, the Louisiana Constitution, and Louisiana statutory law, all as shown below.

## I.   PARTIES

1.      Plaintiff, Ronald Lightell, is an adult citizen of the State of Louisiana and a resident of the Eastern District of Louisiana.

2.      **Made Defendants herein are:**

  a.      The City of Harahan, a municipality of the State of Louisiana, located in the Parish of Jefferson, State of Louisiana, with the capacity to sue and be sued;

  b.      Tim Walker, in his individual capacity, as well as his official capacity as the Chief of the Harahan Police Department, Municipality of Harahan, State of Louisiana, located in the Parish of Jefferson.  As Chief of the Harahan Police Department, Defendant Walker was and is a final policy maker for the Department;

  c.      Keith Moody, in his individual capacity, as well as his official capacity as the Assistant Chief of the Harahan Police Department, Municipality of Harahan, State of Louisiana, located in the Parish of Jefferson

  d.      Manuel "Butch" Adams, in his individual capacity, as well as his official capacity as a Captain of the Harahan Police Department.

  e.      Thomas Bronk, in his individual capacity, as well as his official capacity as a Lieutenant of the Harahan Police Department.

## II.   Jurisdiction and Venue

3.      This action is brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is proper pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343, and 28 U.S.C. 1367, and the First and Fourteenth Amendments

to the Constitution of the United States.  Plaintiff also invokes supplemental jurisdiction over claims under state constitutional and statutory law.

4.      Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391, as the named Defendants are domiciled in the Eastern District of Louisiana.

### III.      FACTUAL ALLEGATIONS

5.      At all times relevant hereto, the Plaintiff was a full-time commissioned police officer with the Harahan Police Department (HPD) and employed by the City of Harahan.  His position was qualified as a Civil Service position under the Harahan Municipal Fire and Police Civil Service system, meaning that the Plaintiff could be terminated from his position only for good cause.  Accordingly, the Plaintiff possessed a constitutionally protected property interest in his job.

6.      The Plaintiff began his employment with the City of Harahan on or about March 23, 2009, as a commissioned police officer.

7.      The Plaintiff subsequently obtained the position of Field Training Officer, granting him the ability to train newly hired police officers.

8.      The Plaintiff subsequently obtained certification as a Firearms Instructor, giving him the ability to train police officers in the use of firearms, marksmanship, offensive/ defensive tactics, firearms safety, and laws regarding the use of force.  The Plaintiff also obtained certification as a Knife Defense Instructor and as an Active Shooter Instructor, which gave him the ability to train officers in tactics for active shooter incidents.

 9.      In 2013, the Plaintiff received his first promotion to Sergeant at the HPD, giving him an increased salary and additional responsibilities for officers under his command.

10.     In August 2018, the Plaintiff was re-promoted to Sergeant, after having stepped down from his previous duties in order to work the day shift so that he could attend to a sick family member.

11.     Prior to March 2019, other than a reprimand in 2009, Plaintiff Lightell had received no disciplinary actions regarding his conduct as a Harahan Police Officer.

12.     Defendant Tim Walker was elected as Harahan Chief of Police in a special election in May 2014.  He was elected to his first full term in November of 2014 and was reelected to a second term in November 2018.

13.     After Defendant Walker was elected, the Plaintiff began hearing rumblings about problems and misconduct in the Walker administration, including the mishandling of evidence, falsification of reports, favoritism, protecting certain officers from disciplinary actions, and the administration requiring officers to write traffic tickets, effectively implementing a quota system.

14.     Sergeants that spoke out against this misconduct and the illegal practices and policies, or refused to enforce illegal policies, were targeted by the administration, and faced retaliation from the Department.  It became common for certain officers to be fired for small violations, while others were protected and shown preferential treatment by the Walker administration.

15.     Over time it became clear that a culture of favoritism had developed inside the administration, protecting certain officers while targeting others for removal, all with the tacit approval or active participation of Defendant Chief Walker.

16.     For example, Defendant Chief Walker began applying disciplinary actions in an unfair, uneven, and retaliatory manner, and used disciplinary findings as an excuse to fire any officers that he wanted removed from the HPD, while other officers were shown special treatment and not fired or even disciplined when it was known that they had violated HPD policies or

procedures. Officers that spoke up about corruption and violations were investigated, disciplined, and/or terminated.

17.     As a result, over the past two years, at least fifteen (15) officers have been forced out of the HPD – having quit or been fired – for a turnover rate of 75%, in a purge of the department of unwanted officers by the Walker administration.

18.     Multiple officers who have been fired within the past year or so were quickly reinstated by the Harahan Fire and Police Civil Service Board ("The Civil Service Board"), which reviews all dismissals. On information and belief, the Civil Service Board made the decisions to reinstate these officers with little need for deliberation, often on directed verdict.

19.     In October 2018, the Plaintiff wrote up Officer Troy Gremillion, an officer under his command, because Gremillion lied after he broke the chain-of-command policy and did not follow an order. However, the Plaintiff was told by his superior, Defendant Lt. Bronk, that this infraction regarding untruthfulness did not have to be reported to Chief Walker or placed in Gremillion's personnel file. This action resulted in the write-up being kept out of Gremillion's permanent record. Capt. Adams was involved and he also did not report the untruthfulness to Chief Walker. Defendant Bronk took this action because Gremillion was a personal friend of his, and he was seeking to protect Gremillion. On information and belief, other similarly situated officers accused of untruthfulness, both prior to and after this write up, were investigated fully and disciplined, including termination. On information and belief, Defendant Bronk took this action to protect Gremillion with tacit or explicit approval from others in the administration because Gremillion was a favored officer.

20.     On January 26, 2019, the Plaintiff and Ofc. Gremillion were involved in a vehicular pursuit of a suspect. During the pursuit, over the HPD radio, Gremillion shouted "shots fired"

and that the suspect was shooting at the officers. After the chase ended with the apprehension of the suspect, and while officers from multiple departments were present, Gremillion told the Plaintiff that he saw a gun and muzzle flashes during the pursuit.

21.     Based on Gremillion's statements during the chase, on the scene, and at the Harahan Police office, the suspect was charged with aggravated assault with a firearm on police officers. Because this was a serious charge, it resulted in a drastic increase in the suspect's bail, which in turn led to his inability to bond out of jail on the pending charges.

22.     After the initial arrest, the Plaintiff tried to meet with Gremillion several times to get more details and a statement regarding what Gremillion had observed, so that the Plaintiff could complete the report on the incident. However, Gremillion avoided speaking with the Plaintiff for some time. When the Plaintiff was finally able to confront Gremillion about what Gremillion had actually observed, Gremillion suddenly claimed that he had not actually seen a firearm. He also claimed that he had never told the Plaintiff about seeing the gun and the muzzle flashes.

23.     Confronted with a serious situation in which it appeared to him that another officer had either lied at the time or was lying now, and realizing that a suspect may have been detained on false charges, the Plaintiff informed his superior via chain of command, Defendant Bronk, of the situation. He also requested guidance from Bronk on how to handle the writing of the report. However, Defendant Bronk stated that he couldn't write the Plaintiff's report for him because he, Bronk, hadn't been on the scene and didn't know what happened. Bronk told the Plaintiff to "work it out" with Gremillion, even after the Plaintiff told Bronk that Gremillion had lied. When the Plaintiff was persistent that he could not "work it out" with Gremillion because Gremillion was lying, Bronk became irate and did not investigate the untruthfulness complaint,  offer advice, or report the untruthfulness complaint through his chain of command.

24.     The Plaintiff therefore wrote the report to the best of his ability based on what Gremillion had said on the scene, without including Gremillion's later retraction of his statements about the firearms.  The Plaintiff then submitted the report for approval.  Capt. Adams approved the report as written despite being aware, because Gremillion had told him, that Gremillion was now claiming that he had never stated that he saw a weapon during the chase.  As a Captain at the HPD, Adams possessed the authority to require Sergeants like the Plaintiff to rewrite their reports as necessary and also had the authority to initiate an investigation before he approved the report.

25.     Wanting to be sure that all facts of the situation were known by the appropriate people, the Plaintiff then contacted the Assistant District Attorney who has handling the case.  He advised the ADA about what had happened and about the fact that Gremillion was now trying to recant his statements regarding the firearm.

26.     On February 22, 2019, the Plaintiff formally requested an investigation into Gremillion's conduct because it appeared Gremillion was being untruthful regarding the "shots fired" incident.  After he received the Plaintiff's request, and after learning that the Plaintiff had made disclosures to the ADA, Defendant Bronk wrote a "Critical Incident Form" that accused Plaintiff of violating departmental policies and asked for further investigation of the matter.  Bronk submitted this form to Adams, who approved it.  It was then approved by Defendant Walker.

27.     These Defendants' authorization of an investigation into Plaintiff's actions was part of their efforts to shield Gremillion and to retaliate against the Plaintiff.  Although Gremillion was also placed under investigation, the Plaintiff was treated differently than Gremillion throughout the investigation and the outcome was foreordained.

28.     Meanwhile, on February 19, 2019, a Harahan resident reported to the HPD front desk with a complaint against an HPD officer who had illegally searched her home and engaged in other unprofessional behavior in response to a call made on February 17, 2019.  As the on-duty Sergeant at the time this complaint was received, Plaintiff Lightell started to investigate the incident but quickly realized the complainant was fearful of retribution if she made a formal complaint against the officer while at the police station.  As part of his duties under HPD policies, the Plaintiff therefore followed up with the complainant at her residence, and learned some basic facts regarding what had happened.  Believing serious misconduct by an officer had occurred, on February 24, 2019, the Plaintiff sent an email to his superiors detailing the facts of his investigation of the potential complaint, noting that it appeared that serious civil rights issues were involved.  Because the complaint concerned such a serious allegation, Plaintiff Lightell withdrew himself from further involvement with the investigation.  On or about February 25, 2019, members of the administration, including Defendants herein, learned of this complaint and that Ofc. Gremillion was in fact the officer against whom the complaint had been made.

29.     Notwithstanding the fact that the Plaintiff's police report was approved by Capt. Adams, who was aware of the issue with Gremillion's statements, on February 27, 2019, the Plaintiff received notice that Chief Walker had approved an investigation against him.  On this date, Plaintiff was given a Notice of Investigation and a copy of the Police Officer's Bill of Rights.

30.     When the Plaintiff requested an investigation into Gremillion's actions, he had specifically requested in writing that Bronk not handle the investigation because Bronk and Gremillion were friends.  Despite that request, and although Bronk had already written a memorandum to Chief Walker concluding that Lightell had violated departmental policies,

Walker placed Bronk in charge of the investigation.  These facts demonstrate the skewed and biased nature of the investigation that followed.

31.     A few weeks later, on March 14, 2019, Plaintiff Lightell was the only officer at a scene inside a house with multiple suspects.  When one of the suspects tried to flee and then started to fight with the Plaintiff, he called for immediate backup.  His multiple requests were ignored by HPD officers, specifically Lt. Bronk and Detective Gremillion.  Eventually, officers from another agency appeared at the scene to support the Plaintiff.  At the time of this event, the Plaintiff's designated back-up units were Ofc. Gremillion and Lt. Bronk.  The Plaintiff reported the failure of Gremillion and Bronk to provide him back up to Chief Walker and to Defendant Asst. Chief Moody, but no action was taken by the administration.

32.     On March 18, 2019, the Plaintiff was called into the office of Chief Walker by Defendants Walker and Moody.  The Plaintiff was not given notice for this meeting and was not given the opportunity to have an attorney present.  The Plaintiff informed Moody that because he was under investigation, he wanted an attorney present before speaking with Chief Walker, but Moody denied this request.  The meeting was not recorded, although Chief Walker made hand written notes.  During this meeting, the Plaintiff reported multiple instances of misconduct and violations of law within the Walker administration, including evidence and departmental property going missing, falsified police reports, the existence of a quota system for tickets, and the protection and favoritism shown to certain officers within the department, including Gremillion.  Plaintiff Lightell specifically told Walker that forcing officers to write tickets or make arrests is against the law, and that he would not participate in such a scheme.  Defendant Walker told Sgt. Lightell he did not need him working for him as a Sergeant if he could not make his officers write tickets.

9

33.     At the conclusion of this meeting, the Plaintiff was informed that he was being placed on administrative leave and was required to go see a psychiatrist for an evaluation.  The purported reason for the Plaintiff being placed on leave was to "protect the integrity" of the on-going investigation.  However, on information and belief, Ofc. Gremillion was not placed on leave despite the fact that he was also a subject of the on-going investigation.

34.     On or about March 20, 2019, the Plaintiff informed a special agent with the Federal Bureau of Investigation, stationed in the New Orleans office, of the implementation and administration of the quota system, the mishandling of evidence, falsified reports, and other abuses of the HPD and Walker administration.  He later met with two agents, on more than one occasion, to discuss the misconduct he had observed at HPD under the Walker administration. The Plaintiff also reported complaints of corruption, civil rights violations, criminal acts, and other violations to the Louisiana State Attorney General's Office.

35.     On April 25, 2019, Defendant Chief Walker advised the Plaintiff that he was terminated from his position as a police officer, effective that date.  The basis for the termination were Bronk's alleged findings during the investigation, more specifically the allegation that the Plaintiff had submitted a false police report and had attempted to persuade a member of the public to file a complaint against Gremillion.

36.     On or about April 25, 2019, Defendant Walker defamed the Plaintiff by advising the Jefferson Parish District Attorney that the Plaintiff had been found to be untruthful as part of Bronk's investigation.

37.     There was no good cause for either the termination or Defendant Walker's defamatory communications regarding the Plaintiff.  In fact, these were acts of retaliation against the Plaintiff because he had attempted to take appropriate action in response to Gremillion's multiple

instances of misconduct and because he had reported violations of law within the Department to Walker.  The retaliatory nature of these acts is demonstrated by a variety of facts, for example, that Defendant Adams was not disciplined in any manner over this incident, even though he approved the Plaintiff's report as written despite knowing of Gremillion's changing story. Gremillion also received no discipline in relation to this incident, and he was never placed on leave, required to see a psychiatrist, or reprimanded, even though his statements on the scene had resulted in false charges being filed against a citizen.  In fact, during this time frame Gremillion was promoted to a Detective with the HPD.  All of these facts reveal the double standard that was at work at the HPD, where some favored officers were protected and others were retaliated against.

38.    The Plaintiff appealed his termination to the Harahan Civil Service Board.  A hearing was held in late June 2019, and the above facts showing the problems with both the substance and process of the investigation were revealed.  At the conclusion of the hearing, the Board unanimously voted to overrule Defendant Walker's termination decision and reinstated the Plaintiff to his position as a Sergeant with the HPD.

39.    However, the harassment and unfair treatment of the Plaintiff and other officers at the HPD continued after the Plaintiff's reinstatement.

40.    Officers who had been listed as witnesses for the Plaintiff during his Civil Service appeal were retaliated against by Defendants Walker, Moody, and others.  For example, Ofc. David Louque was a witness for the Plaintiff during the investigation into the "shots fired" call and offered a statement confirming the Plaintiff's version of events, specifically, that he heard Ofc. Gremillion state he saw a gun and muzzle flashes during the pursuit.  Defendant Bronk and others pressured Louque through multiple interviews to retract this statement.  Then, Louque was

fired by Walker for leaving work sick and stopping at Dot's Diner on the way home to get food, even though he had permission to go home from the Plaintiff, who was his supervising officer on the shift.  Another reason given for Louque's termination was that he had been speeding in his HPD cruiser.  However, Ofc. Gremillion had previously bragged that the administration had caught him on GPS driving 86 miles per hour in his HPD cruiser, and that he had driven home from Baton Rouge to Metairie in less than 45 minutes due to his high rate of speed, but he was not disciplined by the administration.  Again, the pattern where some officers were disciplined while others were not reveals the favoritism and double standards that were at work in the HPD under the Walker administration.

41.     Additionally, Defendants Walker and Moody refused to hire Calvin Olivier, a reserve officer who had been another witness listed for the Plaintiff at his hearing, despite his experience and unblemished record.

42.     In May 2019, Dave Darwin, another HPD officer who was viewed as aligned with the Plaintiff, was fired by Chief Walker for three policy violations: conduct unbecoming a police officer, making false statements, and violating rumor policy by making negative remarks about the Department.  In October 2019, the Civil Service Board quickly reinstated Darwin over Chief Walker's objections.  Like the Plaintiff, Detective Darwin was also disciplined for speaking up about missing evidence and other violations of law.

43.     Plaintiff Lightell was reinstated on July 1, 2019.  After his reinstatement, the Plaintiff was subject to continuous harassment by Defendant Asst. Chief Moody in retaliation for his efforts to expose the abuses and misconduct of the Walker administration, and because his termination had been overturned by the Harahan Civil Service Board.  On information and belief, Defendant Walker approved of and encouraged Moody's harassment of the Plaintiff.  This

harassment was designed and intended to make working conditions so intolerable for the Plaintiff that he would be forced to quit.

44.     For example, in the months after the Plaintiff's reinstatement, Defendant Moody frequently ordered and demanded that the Plaintiff tell him to which outside agencies the Plaintiff had reported misconduct at the HPD, and what materials the Plaintiff had provided to them.  Further, Defendant Moody constantly called the Plaintiff into his office to answer for trivial matters that no other officer would be required to address.

45.     Defendants Walker and Moody also followed the Plaintiff on multiple occasions and otherwise subjected him to unwarranted and excessive scrutiny, in an effort to find a reason to impose discipline against him.

46.     Although Defendant Moody frequently told the Plaintiff that he was not under investigation, he also repeatedly ordered the Plaintiff to give written statements to him for various incidents.  Defendant Moody also repeatedly mischaracterized events to make it appear as if the Plaintiff was being insubordinate, when in fact that did not occur.

47.     For example, at one point the Plaintiff was called to investigate an alleged child abuse case.  He quickly discovered that he was acquainted with one of the key witnesses involved, and accordingly determined that he had a conflict of interest that would not make him the best choice for the investigation.  He reported this concern to Defendant Moody, who stated that he would assign the investigation to one of the two patrol officers who the Plaintiff was then supervising. Because neither of these officers had the proper training and experience to conduct a child abuse investigation, and because they lacked the necessary resources or time in their capacities as patrol officers, the Plaintiff stated that he did not think it was a good idea to assign the investigation to one of them.  Moody responded that he would talk to Chief Walker about the

situation.  However, Moody later ordered the Plaintiff to write a statement about his "inability" to conduct the investigation, which is not what had occurred.  On information and belief, this was an attempt by Defendants Walker and Moody to engineer a reason to discipline the Plaintiff.

48.     In another example, Plaintiff Lightell followed policy when releasing an arrestee for a medical emergency.  However, Defendant Moody accused the Plaintiff of breaking policy by releasing the arrestee.  Moody interrogated the Plaintiff and made the Plaintiff submit both oral and written statements, without providing the Plaintiff the procedural protections granted to Civil Service employees and to police officers under state law.  Defendant Moody then lied to another officer regarding the Plaintiff's actions during the incident, in an effort to undermine the Plaintiff's position as a supervisor and cause undue stress for the Plaintiff.

49.     Shortly after he returned to work, the Plaintiff was called to a scene where a hospice death occurred. The decedent had signed a "do not resuscitate" order, and the Coroner determined the death to be from natural causes.  Because of these circumstances, and based on past policies and practices at the Department, the Plaintiff filed a report on the death but did not notify the detective bureau.

50.     Unbeknownst to the Plaintiff, between the time when he was suspended and his reinstatement, a new policy had been instituted at HPD requiring notification to the detective bureau for every death that occurred, regardless of the cause.

51.     Later in July, the Plaintiff examined Departmental records regarding a DUI arrest that one of his subordinates had raised concerns about, specifically, that Defendant Moody had caused the suspect in the case to be arrested after Moody had inappropriately administered field sobriety tests.  Moody learned that the Plaintiff had examined the records and began to demand that the Plaintiff write memorandums and answer questions about why he had done so.

However, Defendant Moody did not advise the Plaintiff he was under investigation or provide him other protections guaranteed by the Louisiana Police Officer's Bill of Rights, LA R.S. 40:2531.

52.     On July 28, 2019, Defendants Moody and Walker required the Plaintiff to sign two "disciplinary memorandums" that advised him that he had violated departmental policies.  The first violation was for violating the new policy regarding reports of deaths, which Plaintiff was unaware of because he had been (unlawfully) terminated at the time it was promulgated.  The second violation was for allegedly being nine (9) minutes off on his communications log and failing to provide an ending mileage on one occasion.  The memorandums stated that the Plaintiff would be suspended for four (4) days because of the violations.

53.     These memorandums and the discipline they purported to impose were blatant violations of the Plaintiff's rights under the Louisiana Police Officers' Bill of Rights, which provides that an officer must be advised of the nature of any investigation and be given an opportunity to respond prior to discipline being imposed.  Further, these memorandums and the discipline they purported to impose violated the Plaintiff's due process rights because they deprived him of property (4 days of pay) without notice and an opportunity to be heard before the discipline was imposed.

54.     These memorandums also advised that the Plaintiff could appeal the suspensions to Defendant Chief Walker, the very authority who had already authorized the discipline without an investigation.  Understanding his rights under Civil Service law, the Plaintiff instead appealed the purported discipline to the Harahan Civil Service Board, and a hearing was scheduled.  The suspensions were deferred until the hearing could be held.

55.     However, Defendants Moody and Walker's harassment of the Plaintiff continued.
Continuing to flout Civil Service procedures, on August 16, 2019, Moody ordered the Plaintiff to
write a memorandum "explaining [the Plaintiff's] actions pertaining to your alleged appeal to
Civil Service."  Moody demanded to know what evidence and witnesses regarding misconduct at
the HPD the Plaintiff planned to present at his Civil Service hearing.  Moody threatened to put
the Plaintiff's witnesses under investigation.  Of course, Moody and Walker were well-aware of
the misconduct that had happened and which was happening at the HPD, both because the
Plaintiff and others had advised them of the misconduct (e.g., missing evidence and property)
and because they were perpetrating it themselves (e.g., favoritism and retaliation).

56.     Defendant Moody also harassed the Plaintiff by questioning the Plaintiff's subordinates
at the Department about the Plaintiff's actions, and suggesting to them that the Plaintiff was
engaging in misconduct.  These actions by Moody cast the Plaintiff in a bad light and
undermined his authority with the people he was supposed to be supervising.

57.     The Civil Service hearing on the Plaintiff's suspensions was scheduled for September 26,
2019.  However, on or about September 24, 2019, Defendant Moody wrote an email to the Civil
Service Board stating as follows: "By order of the Chief of Police [Walker], effective
immediately, Sgt. Lightell's disciplinary actions outlined in memorandum's [sic] dated 7/28/19
are hereby dismissed with prejudice.  All documentation will be removed, destroyed and stricken
form Sgt. Lightell's personnel file."

58.     In other words, instead of having to explain the suspensions in public and under oath to
the Civil Service Board, Defendants Walker and Moody unilaterally dropped them, showing that
the suspensions were in fact baseless and simply a part of their pattern of harassment and
retaliation against the Plaintiff.  Moody also told the Plaintiff in a phone conversation he did not

want to be embarrassed and wanted a truce.  In another phone conversation, Moody stated words

to the effect that he was "not going to drag the department through social media,  all these

witnesses, and all that kind of crap, for something that never should have been."

59.     Shortly afterwards, Defendant Moody again demanded that the Plaintiff write another

statement, this time about the Plaintiff's conversations with a former HPD officer.  Moody also

advised the Plaintiff that he had received a complaint about the Plaintiff.

60.     Exhausted and demoralized by this continuing pattern of harassment, and concerned that

he would once again be disciplined without cause or formally placed under investigation (which

would have affected his ability to obtain another job in law enforcement), the Plaintiff finally

resigned from the HPD on or about October 1, 2019.

61.     Throughout this ordeal, the Plaintiff was forced to spend money on attorneys and to use

personal time and resources on his defense.  Furthermore, due to the stress of the continued

harassment by Defendants and the associated fear of losing his job, the Plaintiff began

experiencing physical symptoms such as chest pains, stomach problems, headaches, high blood

pressure, and inability to sleep.  The Plaintiff was forced to seek medical treatment for these

stress symptoms.

62.     The Plaintiff also lost his rank, training status, and his vacation and sick leave time when

he resigned from the HPD to take his current position with the JPSO.  His salary and overall

income has been substantially reduced because of his constructive discharge from the HPD.

63.     Furthermore, letters of reprimand, records of investigations, and suspensions can all have

a detrimental effect on future job prospects for an officer, and his or her potential to find

employment in law enforcement.  The Plaintiff's professional reputation as an officer has been

damaged by the Defendants' false and retaliatory accusations against him, as described above.

64.     At all times described herein, the Defendants were acting under color of law in their

capacities as police officers for the City of Harahan.

65.     At all times described herein, the Defendants' conduct was intentional and malicious.  In

the alternative, the Defendants' conduct was committed with deliberate indifference and/or

reckless disregard for the Plaintiff's federal constitutional rights.

## IV.     CAUSES OF ACTION

### A.  Fourteenth Amendment Due Process

66.     The Plaintiff was a Civil Service classified employee under the Harahan Civil Service

Rules.  As such, the Plaintiff could be terminated from his employment only for good cause.  He

therefore had a property interest in his employment that was protected by the due process clause

of the Fourteenth Amendment.

67.     The Plaintiff also possessed the rights and protections afforded by La. R.S. 40:2531 et

seq., the Police Officers' Bill of Rights, which sets forth the mandatory minimum procedures and

substantive prerequisites to discipline, suspend, and/or terminate law enforcement officials.  The

Plaintiff's statutory entitlement to pre-termination substantive procedures give rise to a protected

due process interest under the Fourteenth Amendment.

68.     As described in this Complaint, the Defendants engaged in a pattern of harassment in

order to retaliate against the Plaintiff and to create an intolerable work environment.  In this

manner, the Defendants actively attempted to make the Plaintiff quit his employment, and

ultimately succeeded in constructively discharging him from that employment.  These activities,

which were taken under color of law, violated Plaintiff's right to substantive and procedural due

process as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

69.     The Defendants' conduct was intentional and malicious.  In the alternative, the Defendants' conduct was committed with deliberate indifference and/or reckless disregard for the Plaintiff's federal constitutional rights.

### B.  Constitutional Defamation

70.     As described above, in the course of their pattern of retaliatory harassment and efforts to constructively discharge the Plaintiff from his employment, the Defendants repeatedly defamed the Plaintiff's reputation as a police officer by making false accusations against him.  This pattern of defamation contributed to the constructive discharge of the Plaintiff.

71.     The Plaintiff had a protected property interest in his employment and reputation as a police officer.  The Defendants are therefore liable under § 1983 for their defamation of the Plaintiff, which occurred under color of law, and negatively affected his ability to work as a police officer at the HPD.

### C.  First Amendment Discrimination and Retaliation

72.     The Plaintiff engaged in First Amendment protected speech when he made reports about missing evidence, falsified reports, citizen complaints, misconduct, and the statutorily prohibited quota system.

73.     As described above, the Defendants engaged in harassment amounting to constructive discharge of the Plaintiff from the Harahan Police Department as an act of reprisal for engaging in protected speech.

### D.  *Monell* Violation

74.     Defendant Walker is a final policy maker for the Harahan Police Department, which is an agency of the City of Harahan.

75.     As described above, Defendant Walker engaged in a pattern of retaliation, false accusations, double standards, and harassment against officers that were not favored by him and other authority figures in his administration.  This pattern amounted to the official policy of the Walker administration.

76.     The Plaintiff was a victim of this pattern and practice of retaliation and favoritism.

77.     As such, Defendant Walker, in his official capacity, and the City of Harahan are liable for the violation of the Plaintiff's constitutional rights, as described herein.

### E.  State Law Whistleblower Claim, La. R.S. 23:967

78.     In his capacity as a Sergeant for the City of Harahan, the Plaintiff became aware of unlawful conduct at the HPD, including falsification of reports, mismanagement and theft of evidence and property, favoritism, and attempts to establish a quota system for tickets.

79.     The Plaintiff notified his supervisors, up to and including Defendant Walker, of these violations of law.

80.     As described above, the Defendants retaliated against the Plaintiff because he had made these reports, and ultimately constructively discharged Plaintiff from his employment because he had reported the violations of law within the HPD.

### F.  State Constitutional Law

81.     The Plaintiff had a property interest in his employment that was protected under the Louisiana Constitution of 1974.  As described above, the Defendants violated his right to due process under the State Constitution when they constructively discharged him from his employment through a pattern of retaliatory harassment.

### G. Respondeat Superior

81.     All Defendants' acts described herein were undertaken in the course and scope of their employment with the City of Harahan.  Accordingly, the City of Harahan is liable for all state law torts alleged herein.

### V.     DAMAGES

82.     As a result of the Defendants' conduct, as described above, the Plaintiff has suffered economic damages in the form of lost wages, loss of vacation and sick time, loss of opportunity for additional employment, attorneys' fees, and other economic damages as will be shown at trial.

83.     As a result of the Defendants' conduct, as described above, the Plaintiff has suffered non-monetary damages including damage to his reputation, stress requiring medical treatment, and mental pain and anguish, all as will be shown at trial.

84.     The Plaintiff is also entitled to all costs, fees, and attorney fees associated with the disposition of this matter pursuant to 42 U.S.C. 1988 and/or La. R.S. 23:967, as well as judicial interest from the date of the filing of this complaint or as otherwise provided by law.

**WHEREFORE**, the Plaintiff, Ronald Lightell, prays that after due proceedings are had, there be judgment rendered herein in Plaintiff's favor and against all Defendants, as follows:

1.     Compensatory and punitive damages as prayed for herein;

2.     Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988, and all costs of these proceedings and legal interest;

3.     All other relief as appears just and proper to this Honorable Court.

Respectfully submitted,

/s/ Stephen Haedicke

**STEPHEN J. HAEDICKE** (# 30537)
1040 Saint Ferdinand Street
New Orleans, LA 70117
(504)291-6990 Telephone
(504)291-6995 Fax
Stephen@haedickelaw.com

and

Adam Whitley-Sebti, Esq.
Whitley-Sebti Law LLC
1040 St. Ferdinand Street
New Orleans, LA 70117
Phone: (504) 224-9890
Fax: (504) 273-1346