**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

RONALD LIGHTELL                              CIVIL ACTION

VERSUS                                       NO. 20-672

TIM WALKER, ET. AL.                          SECTION: "B"(1)

<u>**ORDER & REASONS**</u>

Before the court are defendants' Rule 12(b)(6) motion to dismiss (Rec. Doc. 14) and plaintiff's opposition (Rec. Doc. 17). For the reasons discussed below,

**IT IS ORDERED** that defendants' motion to dismiss (Rec. Doc. 14) is **GRANTED IN PART dismissing** official capacity claims against Chief Tim Walker; First Amendment petition claim against all defendants; procedural due process claim against Assistant Chief Keith Moody, Captain Manuel Adams, and Lieutenant Thomas Bronk; state due process claim against all defendants; and defamation claim against all defendants; **and**

**IT IS FURTHER ORDERED** that the motion to dismiss is **DENIED IN PART, retaining** claims against Walker, Moody, Adams and Bronk in their individual capacities; First Amendment retaliation claim against all defendants; *Monell* claim against the City of Harahan; federal and state constructive discharge claims against all defendants; procedural due process claim against the City of Harahan; substantive due process claim against all defendants;

1

state whistleblower claim against all defendants; and *respondeat superior* claim under state law against the City of Harahan.[1]

## I.   <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

Plaintiff Ronald Lightell ("Lightell"), a former police officer with the Harahan Police Department, initiated this action on February 26, 2020, alleging various civil rights claims under 42 U.S.C. § 1983 and various other federal and state laws. Rec. Doc. 1. After defendants filed its first motion to dismiss on April 24, 2020, Rec. Doc. 5, plaintiff filed an amended complaint on May 27, 2020 to "clarify" and add "factual details regarding some claims". Rec. Docs. 7, 11. The subject motion to dismiss the amended complaint was filed on July 1, 2020. Rec. Doc. 14.

On March 23, 2009, Lightell began employment with the City of Harahan as a commissioned police officer. Rec. Doc. 11 at 3. In 2013, Lightell received a promotion to Sergeant at the Harahan Police Department ("HPD") making him responsible for officers under his command. *Id.* at 4. Lightell was subsequently re-promoted to sergeant in August 2018 after having stepped down from his previous duties to care for a family member. *Id.* Per Lightell, prior to March 2019, other than a reprimand in 2009, Lightell never

---

[1] Further review of retained claims will occur to promote a just and inexpensive resolution of triable issues, including avoidance of jury confusion that may lead to inconsistent or duplicative findings on certain federal and state claims. Before the anticipated filings of summary judgment motions, parties shall meet to address those concerns in a good faith effort to achieve amicable results. Thereafter, the undersigned welcomes a joint request to further assist that effort.

received a disciplinary action regarding his conduct as a Harahan Police Officer. *Id.*

According to Lightell, after Tim Walker ("Chief Walker") was elected as Harahan Chief of Police in May 2014, Lightell began hearing rumors of potential misconduct in Chief Walker's administration, including the mishandling of evidence, falsification of reports, favoritism, protecting certain officers from disciplinary actions, and the administration implantation of a quota system. *Id.*

According to Lightell, in October 2018, Lightell wrote up Officer Troy Gremillion ("Gremillion"), an officer under his command. *Id.* at 5. However, Lightell alleges that he was told by his superior, Lieutenant Thomas Bronk ("Lt. Bronk") that this infraction did not have to be reported to Chief Walker or placed in Gremillion's personal file. *Id.*

On January 26, 2019, Lightell and Gremillion were involved in a vehicular pursuit of a suspect. *Id.* at 6. According to Lightell, during the pursuit, over the HPD radio, Gremillion shouted "shots fired" and reported that the suspect was shooting at the officers. *Id.* Lightell alleges that after the chase ended with the apprehension of the suspect, Gremillion reported to Lightell that he saw a gun and muzzle flashes during the pursuit. *Id.* Lightell alleges that when he later spoke with Gremillion, to get more details to complete his report, Gremillion denied making the

3

original statements and claimed to have never seen a gun or muzzle flashes. *Id.* Lightell claims he informed Lt. Bronk of the situation and requested guidance from Bronk on how to handle the writing of the report. *Id.* Lightell alleges that Bronk told him to "work it out" with Gremillion, and failed to investigate Lightell's complaint, offer advice, or report the complaint through his chain of command. *Id.* at 7. Lightell wrote the report based on Gremillion's remarks at the scene without including Gremillion's later retraction of his statements. *Id.*

Later, Lightell contacted the Assistant District Attorney ("ADA") who has handling the case about the vehicle pursuit and advised the ADA of Gremillion's inconsistencies. *Id.* On February 22, 2019, Lightell formally requested an investigation into Gremillion's conduct regarding the "shots fired" incident. *Id.* According to Lightell, after Bronk received plaintiff's request and learned that Lightell made disclosures to the ADA, Bronk wrote a "Critical Incident Form" that accused Lightell of violating departmental policies and requested further investigation of the matter. *Id.* Lightell alleges that the investigation into his actions was part of an effort to retaliate against him and shield Gremillion and that the effort was approved by Lt. Bronk, Captain Adams and Chief Walker. *Id.*

According to Lightell, on February 19, 2019, a Harahan resident made a complaint against an HPD officer to the HPD front

desk. *Id.* at 8. Lightell alleges that as the on-duty sergeant at the time the complaint was received, Lightell started to investigate the incident but learned the complainant was fearful of making the complaint against the officer at the police station. *Id.* Lightell followed up with the complainant at her residence. *Id.* On February 24, 2019, Lightell sent an email to his superiors detailing the facts of his investigation of the potential complaint and withdrawing himself from further involvement with the investigation, citing the seriousness of the allegations. *Id.* Per Lightell, on or about February 25, 2019, members of the administration, including defendants, learned of the complaint and that Gremillion was in fact the officer against whom the complaint had been made. *Id.*

On February 27, 2019, Lightell received notice that Chief Walker had approved an investigation against the former concerning the report submitted about the January 26, 2019 vehicular pursuit. *Id.* Lightell was given a Notice of Investigation and a copy of the Police Officer's Bill of Rights. *Id.*

On March 14, 2019, Lightell was the only officer at a scene inside a house with multiple suspects when one of the suspects tried to flee and started to fight with Lightell. *Id.* at 9. Lightell alleges he made multiple requests for immediate backup but was ignored by HPD officers, specifically Lt. Bronk and Gremillion. *Id.* Lightell alleges that officers from another agency

eventually appeared at the scene to support Lightell. *Id.* According to Lightell, at the time of the incident, Lightell's designated back-up units were Gremillion and Lt. Bronk. *Id.* Lightell reported the alleged failure to provide him back up to Chief Walker and to Keith Moody ("Assistant Chief Moody"), but no action was taken by the administration. *Id.*

On March 18, 2019, Chief Walker and Assistant Chief Moody called Lightell into Walker's office. *Id.* Aware of the investigation against him, Lightell asserts he requested to have an attorney present before speaking to Walker, which was subsequently denied by Moody. *Id.* During this meeting, Lightell alleges to have reported multiple instances of misconduct and violations of law within the administration, including evidence and departmental property going missing, falsified police reports, the existence of a quota system for tickets, and the protection and favoritism shown to certain officers within the department, including Gremillion. *Id.* at 9-10. Lightell alleges telling Chief Walker that forcing officers to write tickets or make arrests is against the law and that he would not participate in such a scheme. *Id.* at 10. Lightell alleges that Chief Walker told him he did not need him working as a sergeant if he could not make his officers write tickets. *Id.* At the conclusion of the meeting, Lightell was informed that he was being placed on administrative leave and was

required to see a psychiatrist for an evaluation to "protect the integrity" of the on-going Investigation. *Id.*

On or about March 20, 2019, Lightell informed a special agent with the New Orleans office of the Federal Bureau of Investigation of the implementation and administration of the quota system, the mishandling of evidence, falsified reports, and other alleged abuses of the HPD and administration. *Id.* Lightell also reported alleged complaints of corruption, civil rights violations, criminal acts, and other violations to the Louisiana State Attorney General's Office. *Id.*

On April 25, 2019, Chief Walker advised Lightell that he was terminated from his position as a police officer, effective that date for submitting a false police report and attempting to persuade a member of the public to file a complaint against Gremillion. *Id.* On or about April 25, 2019, Chief Walker advised the Jefferson Parish District Attorney that Lightell had been found to be untruthful as part of Lt. Bronk's investigation. *Id.* at 11.

Lightell appealed his termination to the Harahan Civil Service Board. *Id.* A public hearing was held in late June 2019, in which Lightell characterized his termination as "unfair and unjust, and the result of misconduct, double standards, and favoritism that existed at the HPD under Walker's administration." *Id.* at 11-12. Lightell alleges the hearing attracted widespread attention that caused moving it to a larger venue, warranted a

Facebook livestream, and was attended by the press and the current and former mayors of Harahan. *Id.* at 12. According to Lightell, the vast interest in his hearing was prompted by allegations of misconduct and favoritism within the HPD, which was of intense and growing concern within the city. *Id.* at 12-13. According to Lightell, officers who were listed as witnesses for Lightell during his Civil Service appeal were retaliated against by Chief Walker, Assistant Chief Moody, and others. *Id.* at 13. At the conclusion of the hearing, the Board unanimously voted to overrule Chief Walker's termination decision. *Id.* Lightell was reinstated on July 1, 2019. *Id.* at 14.

According to Lightell, Assistant Chief Moody and others subjected him to continuous harassment post-hearing. *Id.* Assistant Chief Moody frequently ordered Lightell to tell him the outside agencies to which Lightell had reported misconduct at the HPD, and what materials Lightell had provided to them. *Id.* Further, per Lightell, Assistant Chief Moody constantly called Lightell into his office to answer for alleged trivial matters that no other officer would be required to address. *Id.* Chief Walker and Assistant Chief Moody also allegedly followed Lightell on multiple occasions and otherwise subjected him to unwarranted and excessive scrutiny to find an excuse discipline him. *Id.* at 15. According to Lightell, Moody repeatedly ordered him to give written statements for various incidents. *Id.*

Shortly after Lightell returned to work, he was called to a scene where a hospice death occurred. *Id.* at 16.  The decedent had signed a "do not resuscitate" order, and the Coroner determined the death to be from natural causes. *Id.* Lightell filed a report on the death but did not notify the detective bureau. *Id.* According to Lightell, between the time when he was suspended and his reinstatement, HPD implemented a new policy requiring notification to the detective bureau for every death that occurred, regardless of the cause. *Id.* Lightell asserts that he was not made aware of the new policy. *Id.*

According to Lightell, in late July 2019, Lightell examined departmental records regarding a DUI arrest where there were concerns about Assistant Chief Moody's administration of a field sobriety tests. *Id.* Assistant Chief Moody learned that Lightell had examined the records and required him to write memorandums and answer questions on why he examined the records. *Id.*

On July 28, 2019, Assistant Chief Moody and Chief Walker required Lightell to sign two "disciplinary memorandums" that advised him that he had violated departmental policies. *Id.* The first violation was for violating the new policy regarding reports of deaths, and the second violation was for allegedly being nine (9) minutes off on his communications log and failing to provide an ending mileage on one occasion. *Id.* at 17. The memoranda stated Lightell would be suspended for four (4) days because of the

violations. *Id.* Lightell appealed the disciplinary action to the Harahan Civil Service Board, and a hearing was scheduled with suspensions being deferred until the hearing could be held. *Id.* Lightell noted in his application to the Civil Service Board that the actions taken against him were retaliatory in nature in view of the Walker Administration's attempt to intimidate, harass and eventually force him toward resignation. *Id.*

According to Lightell, on August 16, 2019, Assistant Chief Moody ordered him to write a memorandum explaining [Lightell's] actions pertaining to your alleged appeal to Civil Service. *Id.* The Civil Service hearing on Lightell's suspensions was scheduled for September 26, 2019. *Id.* at 18. However, on or about September 24, 2019, Moody wrote an email to the Civil Service Board stating as follows: "By order of the Chief of Police [Walker], effective immediately, Sgt. Lightell's disciplinary actions outlined in memorandum's [sic] dated 7/28/19 are hereby dismissed with prejudice. All documentation will be removed, destroyed and stricken form Sgt. Lightell's personnel file." *Id.*

Shortly afterwards, according to Lightell, Assistant Chief Moody demanded that Lightell write another statement - this time about Lightell's conversations with a former HPD officer and a complaint Moody allegedly received about Lightell. *Id.* at 19. On or about October 1, 2019, Lightell resigned from the HPD. *Id.*

On May 27, 2020, Lightell amended the complaint to clarify his First Amendment and Whistleblower claims. Rec. Doc. 11 at 1. However, he realleges fully each paragraph set forth in his original complaint. *Id.*

Defendants filed the instant motion to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Rec. Doc. 5. Plaintiff filed a response in opposition. Rec. Doc. 9. Plaintiff filed an amended complaint. Rec. Doc. 11. Defendants then filed a subsequent motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Rec. Doc. 14. Plaintiff timely filed an opposition to the defendant's second motion to dismiss. Rec. Doc. 17.

## II.   <u>LAW AND ANALYSIS</u>

### a. <u>Standard of Review</u>

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's complaint "must contain enough facts to state a claim to relief that is plausible on its face." *Varela v. Gonzalez*, 773 F.3d 704, 707 (5th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotes omitted)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the

plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). However, the court is not bound to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Taylor v. Books A Million, Inc.,* 296 F.3d 376, 378 (5th Cir. 2002). When deciding whether a plaintiff has met his burden, a court "accept[s] all well-pleaded factual allegations as true and interpret[s] the complaint in the light most favorable to the plaintiff, but '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements' cannot establish facial plausibility." Snow *Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 520 (5th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff brings claims against defendants for alleged violations of First and Fourteenth Amendment rights, *Monell* violations, defamation, Louisiana Whistleblower violations, Louisiana constitutional law violations, and *respondeat superior*. Defendants move for dismissal of all claims. Accordingly, each claim will be separately addressed.

### b. **Claims against Chief Walker in his official capacity**

In *Kentucky v. Graham*, the Supreme Court held that an official capacity suit is "only another way of pleading an action against an entity of which an officer is an agent" and is to be treated as a suit against the entity. 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). The Fifth Circuit has enforced an identical rule and barred claims brought in a single action against official capacity individuals and against the entity of which they are members. In *Sims v. Jefferson Downs Racing Association, Inc.*, the Fifth Circuit held that, due to the nature of official capacity suits, a judgment against a corporation and its officer would "effectively make the corporation liable twice for the same act." 778 F.2d 1068, 1081 (5th Cir. 1985). Moreover, a judgment against an individual acting in an official capacity and against the entity that employs him on the same claim is equivalent to a judgment against the entity twice over and is therefore barred by virtue of subjecting a defendant-entity to "duplicative" or "redundant" liability. *See Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 262 (5th Cir. 1999); *see also Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001). However, separate claims brought against an official and his entity in the same action are permitted and governed by the general rules of pleading. *Id.*

To the extent plaintiff asserts Section 1983 claims against Chief Walker in his official capacity, those claims appear to mirror the Section 1983 claim against the City of Harahan — that

plaintiff's constitutional right to free speech was violated by the Harahan Police Department's discipline and constructive discharge of plaintiff for speaking out against misconduct, double standards, and favoritism within the Harahan Police Department. As previously stated, the Fifth Circuit has held that such actions are barred by virtue of subjecting a defendant-entity to "duplicative" or "redundant" liability. *Indest*, 164 F.3d at 262; *Romero*, 256 F.3d at 355. Accordingly, plaintiff was required to clarify in his pleadings if he is in fact asserting different claims against Chief Walker in his official capacity and the City of Gretna; otherwise, dismissal of one of the duplicative claims or sets of claims is appropriate.

Plaintiff concurs that official capacity claims against Chief Walker are duplicative claims. Rec. Doc. 17 at 16. Therefore, the court will dismiss the Section 1983 claims against Defendant Chief Walker in his official capacity and proceed with analysis of plaintiff's Section 1983 First Amendment claim against the City of Harahan.

### c. Section 1983 Claims

To bring a claim under 42 U.S.C. § 1983, a plaintiff is required to allege facts demonstrating that: (1) the defendant violated the Constitution or federal law; and (2) that the defendant was acting under the color of state law while doing so. *See Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252-53 (5th Cir.

2005). Section 1983 reads, in pertinent part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory
> or the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity,
> or other proper proceeding for redress....

42 U.S.C. §1983.

Plaintiff brings claims for violations of his First Amendment rights pursuant to Section 1983 against the City of Harahan, and against Chief Walker, Assistant Chief Moody, Captain Adams, and Lieutenant Bronk in their individual capacities. *See* Rec. Doc. 11. Defendants seek dismissal of the Section 1983 claims because: (1) Chief Walker, Assistant Chief Moody, Captain Adams, and Lieutenant Bronk are entitled to qualified immunity on all claims against them in their individual capacities; and (2) Plaintiff has failed to allege that any "policy or custom" resulted in a violation of a constitutional right to establish a claim against the City of Harahan. Rec. Doc. 14-1 at 7-12. Accordingly, we will proceed to address each of these issues in turn.

**i. Assistant Chief Moody, Captain Adams, and Lieutenant Bronk are not entitled to qualified**

**immunity on the Section 1983 claims brought against them in their individual capacities.**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is an "immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 237, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). In this manner, "[o]ne of the most salient benefits of qualified immunity is protection from pretrial discovery, which is costly, time-consuming, and intrusive." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). Once a defendant invokes the defense of qualified immunity, the plaintiff carries the burden of demonstrating its inapplicability. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).

In *Saucier v. Katz*, the Supreme Court set forth a two-part framework for analyzing whether a defendant was entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Part one asks the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201, 121 S.Ct. 2151. Part two

inquires whether the allegedly violated right is "clearly established" in that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. The court does not have to address these two questions sequentially; it can proceed with either inquiry first. *See Pearson*, 555 U.S. at 236, 129 S.Ct. 808 ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."); *see also Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 469 (5th Cir. 2014).

Commencing with the second prong of the *Saucier* framework, the court must determine whether plaintiff has alleged a violation of a clearly established constitutional right. When deciding whether the right allegedly violated was "clearly established," the court asks whether the law so clearly and unambiguously prohibited the conduct such that a reasonable official would understand that what he was doing violated the law. *May v. Strain*, 55 F.Supp.3d 885, 897 (E.D. La. 2014) (Brown, J.) (citing *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013)). "Answering in the affirmative requires the court to be able to point to controlling authority — or a robust consensus of persuasive authority — that defines the contours of the right in question with a high degree of particularity. This requirement establishes a high bar." *Id.* When there is no controlling authority specifically prohibiting a

defendant's conduct, the law is not clearly established for the purposes of defeating qualified immunity. *Id.*

The reasonableness of a defendant's conduct depends on whether he/she had "fair notice" that their conduct was unlawful "judged against the backdrop of the law at the time of the conduct." *Kiesla v. Hughes*, 138 S.Ct. 1148, 1152 (2018). "Law enforcement officers who reasonably but mistakenly commit a constitutional violation are entitled to immunity." *Williams*, 180 F.3d at 703 (quoting *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 490 (5th Cir. 2001)). "Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury." *Brown*, 623 F.3d at 253 (quoting *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004)).

The Fifth Circuit indicated in *Shaw v. Villanueva* that once a defendant invokes qualified immunity at the pleadings stage, the plaintiff "bears the burden of pleading facts that demonstrate liability and defeat immunity." 918 F.3d 414, 417 (5th Cir. 2019). In doing so, a plaintiff must allege sufficient facts (1) that the official violated a statutory or constitutional right and (2) that the right was clearly established at the time of the challenged conduct. *Id.*

Defendants dispute whether plaintiff has alleged violations of his constitutional rights, or that his constitutional right to free speech was clearly established at the time of the alleged

violation. Rec. Doc. 14-1. Defendants argue that plaintiff cannot overcome the burden to defeat their assertion of qualified immunity. *Id.*

Plaintiff generally alleges that defendants' discipline and constructive discharge of plaintiff in retaliation for plaintiff's speech, petition and subsequent appeal to the Civil Service Board, constitute a violation of clearly established First Amendment rights to free speech and petition. Rec. Doc. 11 at 21. Therefore, plaintiff argues that Chief Walker, Asst. Chief Moody, Capt. Adams and Lt. Bronk are not entitled to qualified immunity because Plaintiff had a clearly established right to free speech, which they violated, and their actions were not objectively reasonable. Rec. Doc. 17.

As further discussed below, this court finds that the plaintiff has plausibly stated a First Amendment free speech claim against noted defendants in their individual capacities.

### ii. Plaintiff has stated a First Amendment discrimination and retaliation claim

To establish a First Amendment retaliatory discharge claim, plaintiff must prove that:

(1) he suffered an adverse employment action, (2) his speech involved a matter of public concern, (3) his

19

> interest in commenting on the matter of public concern
> outweighed the defendant's interest in promoting
> efficiency (balancing under *Pickering v. Board of
> Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811
> (1968)), and (4) his speech was a substantial or
> motivating factor behind the defendant's actions.

*Harris v. Victoria Indep. Sch. Dist.,* 168 F.3d 216, 220 (5th Cir.1999); *James v. Texas Collin Cty.*, 535 F.3d 365, 375-76 (5th Cir. 2008).

Plaintiff asserts suffering an adverse employment action, specifically a campaign of retaliatory harassment amounting to constructive discharge from HPD because he exercised his first Amendment rights on two occasions. Rec. Doc. 11 at 21 ¶75, 76, 77. First, plaintiff alleges engagement in First Amendment protected speech on matters of public concern when he raised issues of misconduct, double standards, and favoritism within HPD in the public forum at civil service hearings in June 2019. *Id.* Second, plaintiff asserts exercising First Amendment rights to petition the government for redress of grievance when he appealed his termination to the Civil Service Board and when he appealed his suspension to the Civil Service Board. *Id.* We will analyze each instance separately.

### 1. The Termination Hearing

Defendants argue that the plaintiff's First Amendment claim with reference to the termination hearing fails because plaintiff did not suffer an adverse employment action, and his speech was

neither a matter of public concern nor was it directly identified in plaintiff's amended complaint. Rec. Doc. 14-1 at 15-20.

> (1)  *Lightell suffered an adverse employment action*

To succeed in a First Amendment retaliation claim, pursuant to 42 U.S.C. § 1983, plaintiff must show he suffered an adverse employment action. *Harris*, 168 F.3d at 220. Employer actions that can result in liability include more than just actual or constructive discharge from employment. *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999). "Adverse employment actions can include discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Id.* An employer's activities may be deemed to amount to a constructive discharge only if "the employer made conditions so intolerable that the employee reasonably felt compelled to resign." *Shawgo v. Spradlin*, 701 F.2d 470, 481 (5th Cir. 1983); *Kelleher v. Flawn*, 761 F.2d 1079, 1086 (5th Cir. 1985). "[A] constructive discharge claim requires a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) (internal citation and quotation marks omitted) (finding that the plaintiff failed to state a First Amendment violation because her discharge resulted from an independent psychiatric evaluation and not retaliation for her grievances).

In *Sharp*, the Fifth Circuit upheld a jury verdict finding the plaintiff's transfer to another department constituted a constructive demotion. *Sharp*, 164 F.3d at 934. The Fifth Circuit held that the evidence supported the plaintiff's argument that her supervisors' encouragement of retaliatory acts and even participation in them drove her to initiate the transfer, to the extent that it was no longer voluntary. *Id.*

Plaintiff Lightell asserts that defendants' harassment amounted to constructive discharge. Rec. Doc. 11 at 21 ¶ 77. More specifically, he alleges that Chief Walker approved and encouraged Moody's acts of harassment, including demanding Lightell to inform him of what agencies to whom he reported HPD's misconduct, following Lightell on multiple occasions to find grounds for discipline, and repeatedly ordering Lightell to give written statements for various incidents. *Id.* at 14-15.

Defendants argue that the alleged treatment does not rise to the level of constructive discharge as they believe it does not constitute harassment. Rec. Doc. 14-1 at 16. Specifically, defendants do not find it unreasonable for Lightell's superior officers to question him about his decisions as it relates to his job performance and competency as a police officer. *Id.* However, defendants fail to address the other instances of allegedly harassing conduct that plaintiff asserts drove him toward resignation. Therefore, because plaintiff has set forth factual

allegations to support plausible claims of adverse employment action, and accepting as we must those allegations as true in the Rule 12 context, defendants' argument fails at this stage.

>    (2)   *Lightell's speech involved a matter of public concern*

The First Amendment, applicable to the states through the Fourteenth Amendment, provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST. amend. I. There is no public-employee exception; the First Amendment "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos,* 547 U.S. 410, 417 (2006). To determine whether a public employee's First Amendment right has been violated, courts "ask a threshold question: Was the employee's speech made pursuant to the employee's duties or as a citizen on a matter of public concern?" *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 469 (5th Cir. 2014) (citing *Garcetti,* 547 U.S. at 418). If the employee spoke as a citizen, courts must then "balance the employee's speech interest with the government employer's interest in promoting the efficiency of the public services it performs." *Cutler,* 767 F.3d at 469 (quoting *Lane v. Franks*, 573 U.S. 228, 231 (2014) (internal quotes omitted)).

In determining whether a public employee spoke as part of his job duties or as a citizen, courts consider "factors such as job descriptions, whether the employee communicated with coworkers or with supervisors, whether the speech resulted from special knowledge gained as an employee, and whether the speech was directed internally or externally." *Johnson v. Halstead*, 916 F.3d 410, 422 (5th Cir. 2019) (quoting *Rogers v. City of Yoakum*, 660 F. App'x 279, 283 (5th Cir. 2016) (internal quotes omitted)).

Plaintiff alleges that speech during the June 2019 Civil Service hearing was speech that involved a matter of public concern because he raised issues of misconduct, double standards and favoritism within the department at the hearing. Rec. Doc. 11 at 21 ¶75. Furthermore, he asserts the speech was a matter of public concern because the hearing was largely attended by the public, recorded by the news media, and livestreamed on social media. Rec. Doc. 17 at 20. Plaintiff also alleges that the large attendance at the hearing demonstrated his speech was a matter of great concern to the people of Harahan. *Id.*

In support of his argument, plaintiff cites to the non-binding *Presley v. Graham* case, wherein a city police officer brought First Amendment retaliation claims against a city police department, its attorney, and a city. *Presley v. Graham*, 936 F. Supp. 2d 1316. (M.D. Ala. 2013) Considering a motion to dismiss those claims, the court determined that the police officer's lawsuit against the

city alleging gender discrimination was speech by an employee on a matter of public concern protected under the First Amendment. While Presley alleged personal grievances, the complaint also alleged a custom or policy of discrimination by city officials, media attention, and was thereby considered a public grievance, rather than an internal complaint. *Id.* at 1323. Moreover, the lawsuit in question involved not only matters of personal interest to Ms. Presley, as the city had denied her promotion and disciplined her, but it also implicated concerns broader in scope than ordinary workplace grievances because she further alleged that the discrimination suffered was a result of an official custom or policy of illegal gender discrimination. *Id*. The court considered the content, form, and context of the speech in its determination that the speech involved a matter of public concern. *Id.* at 1324.

Defendants allege that plaintiff's speech did not involve a matter of public concern because the purpose of the Civil Service Hearing was for the sole purpose of determining whether plaintiff should be reinstated. Rec. Doc. 14-1 at 18. Defendants argue that speech was made in the context of plaintiff's employment status, and that plaintiff was following the appropriate grievance procedure by petitioning the Civil Service Board to appeal his termination. *Id.*

It is immaterial whether the speech was made at a hearing to appeal plaintiff's termination, where the speech concerned alleged misbehavior within the police department. The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department. *Brawner v. City of Richardson, Tex.,* 855 F.2d 187, 191–92 (5th Cir. 1988) (finding in favor of the plaintiff whose statements against the police chief and others represented a matter of public concern). Because the speech at issue complained of misconduct within the police department, it should be classified as speech addressing a matter of public concern.

Additionally, defendants argue the amended complaint demonstrates the interest in the Civil Service Hearing but failed to establish exactly what was said that was a matter of public concern for which plaintiff was allegedly retaliated. Rec. Doc. 14-1 at 18. Defendants correctly state that plaintiff is required to identify the speech at issue. To prove a claim, plaintiff must precisely identify the "speech as to which First Amendment protection is claimed, which would permit consideration of its content, context, and form as required by the Supreme Court." *Foley*, 355 F.3d at 342. Plaintiff in claiming that a defendant retaliated against him or her for making statements protected by the First Amendment, is required to be specific as to when the

26

statement or statements were made, to whom the statements were made, whether the statements were oral or written, and the content of those statements. *Id.*

While plaintiff has not directly quoted what particular statement to which First Amendment protection is claimed, plaintiff has identified the speech. Plaintiff alleges the speech concerned his allegations against the HPD administration regarding a culture of misconduct and favoritism concerning not only the plaintiff himself but also other HPD officers who had been forced out of HPD or terminated. Rec. Doc. 11 at 12; Rec. Doc. 17 at 21. Further, it is clear the plaintiff asserts the speech was made orally at the Civil Service Hearing in June 2019 to the Civil Service Board with the public as an audience. *Id.* Based on this record, the plaintiff's speech involved a matter of public concern.[2]

> (3) *His interest in commenting on the matter of public concern outweighed the defendant's interest in promoting efficiency.*

As it relates to the third element, the Fifth Circuit has held that it must "balance the employee's interest, as a citizen, in commenting upon matters of public concern against the interest of the State, as an employer, in promoting the efficiency of the

---

[2] Discovery should reveal the identity of other HPD officers who were allegedly similarly treated.

public services it performs through its employees." *Branton*, 272 F.3d at 739 (quoting *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891; *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731) (internal quotes omitted). This inquiry "involves whether the speech: (1) was likely to generate controversy and disruption, (2) impeded the department's general performance and operation, and (3) affected working relationships necessary to the department's proper functioning." *Brawner*, 855 F.2d at 192. In *Brawner*, the defendants argued that the police department's interest in conducting thorough investigations outweighed the plaintiff's interest in expressing dissatisfaction with his treatment during such an investigation. *Id.* The Fifth Circuit rejected this argument, holding that "if the allegations of internal misconduct are indeed true, [the plaintiff's] statements could not have adversely affected the proper functioning of the department since the statements were made for the very reason that the department was not functioning properly due to corruption. *Id.*

Neither plaintiff nor defendants put forth any argument that plaintiff's interest in commenting on the misconduct, if found to be a matter of public concern, is outweighed by the government's interest in the efficient provision of public services. Given that plaintiff has a legitimate interest in reporting misconduct within HPD, and no government interest in promoting efficiency or functionality has been identified that would suffer from

28

plaintiff's speech, the balancing of interests weighs in favor of plaintiff's free speech.

> (4) *His speech was a substantial or motivating factor behind the defendant's actions.*

Regarding the fourth and final element, plaintiff asserts that his speech regarding the misconduct caused the discipline, harassment and constructive termination against him. Rec. Doc. 11. Plaintiff's alleged speech about the misconduct took place at the June 2019 Civil Service Board hearing. *Id.* Plaintiff has alleged multiple instances of harassment including a suspension, that was recalled, since the alleged speech was made. *Id.*

Defendants argue that termination of plaintiff's employment was not precipitated by any adverse employment action, but that plaintiff voluntarily resigned from HPD, and his working conditions were not such that the resignation could be deemed a constructive discharge. Rec. Doc. 14-1 at 16. Defendants assert there were various instances in which plaintiff failed to follow department policy. *Id.* However, taking plaintiff's factual allegations as true, given the factual allegations of incidents of reprisal occurring soon after plaintiff criticized HPD at the Civil Service hearing, plaintiff has plausibly established that his speech regarding the misconduct precipitated the adverse employment actions of discipline and constructive termination.

Thus, plaintiff has plausibly established all four elements required to satisfy a **Section 1983** First Amendment retaliation claim. Accordingly, the First Amendment claims against defendants Moody, Adams and Bronk in their individual capacities may not be dismissed upon a Rule 12 motion to dismiss. There is no dispute that their respective actions were taken under color of the law, and it is plausible they collectively violated plaintiff's constitutional rights.

### 2. <u>The Appeal of Suspension</u>

The First Amendment's Petition Clause "protects 'the right of the people ... to petition the Government for a redress of grievances.'" *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 382, 131 S.Ct. 2488, 180 L.Ed.2d 408 (2011) (quoting U.S. CONST. AMEND I.).

It appears plaintiff attempts to bring a "petition" claim based on the Civil Service Board not hearing his suspension grievance because Chief Walker dismissed the disciplinary action against plaintiff before the hearing could be held, thereby relinquishing the need for such hearing. Rec. Doc. 11 at 21 ¶76. Plaintiff alleges that Chief Walker's dismissal violated his right to petition the government. *Id.* at 21 ¶77.

Plaintiff's argument fails because that attempted grievance claim did not involve a matter of public concern and instead was a matter of private concern. Indeed, "[i]f a public employee

petitions as an employee on a matter of purely private concern, the employee's First Amendment interest must give way, as it does in speech cases." *Harmon v. Dallas Cty., Texas*, 927 F.3d 884, 894–95 (5th Cir. 2019), as revised (July 9, 2019) (quoting *Borough of Duryea, Pa. v. Guarnieri,* 564 U.S. 379, 398 (2011)).

Just as the court was clear in *Harmon,* to be clear, the plaintiff's speech — his reporting of misconduct within the HPD which *is* a matter of public concern — is not at issue here. Rather, the issue concerns the plaintiff's *grievance*. "By its very nature, however, an employee's grievance from termination will not ordinarily constitute a matter of public concern." *Id.; See Borough of Duryea,* 564 U.S. at 398 ("A petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the  employment context."); *Gibson v. Kilpatrick*, 838 F.3d 476, 487 (5th Cir. 2016) ("Internal personnel disputes and management decisions are rarely a matter of public concern.").

There is no factual support to find that plaintiff was using the petition appealing his suspension as a platform to publicly restate his concerns of misconduct within the HPD. He, instead, was merely using the petition to appeal his suspension as any employee, private or public, would do. In other words, the point of the plaintiff's appeal was not to present concerns about

31

misconduct within the HPD but to appeal his suspension. Therefore, because the allegations surrounding the plaintiff's appeal does not constitute a matter of public concern, his Section 1983 First Amendment claim as it pertains to the appeal fails and is hereby dismissed.

### iii. Plaintiff has stated a *Monell* claim against the City of Harahan

With respect to a Section 1983 claim against an entity, the Supreme Court held in *Monell v. Department of Social Services of City of New York*, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury [ ] the government as an entity is responsible under § 1983." 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Moreover, "[a] § 1983 plaintiff [ ] may be able to recover from a municipality without adducing evidence of an affirmative decision by policymakers if able to prove that the challenged action was pursuant to a state 'custom or usage.'" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 484, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). In order to establish a Section 1983 claim against a municipality, the official policy must be the cause and moving force of the constitutional violation. *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. Finally, the "policymaker must have either actual or constructive knowledge of the alleged policy." *Cox v. City of*

*Dallas*, 430 F.3d 734, 748-49 (5th Cir. 2005) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

A municipality, like Harahan, is a "person" suable under § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). But a municipality is not vicariously liable for the misconduct of its employees; it is liable only for its own misconduct. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). So, a plaintiff cannot recover against a municipality under § 1983 unless he proves that "action pursuant to official municipal policy" caused his injury. *Monell*, 436 U.S. at 691. This is known as a "*Monell*" claim. *See Id.* To state a *Monell* claim, a plaintiff must plead facts that plausibly establish (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *Ratliff v. Aransas Cty., Tex.*, 948 F.3d 281, 285 (5th Cir. 2020)(citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

The policy element "includes the decisions of a government's law-makers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61 (citation omitted). To survive a motion to dismiss, "a complaint's description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory; it must contain specific facts." *Pena v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018)

(quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (internal quotes omitted)).

Plaintiff argues that Chief Walker as an official policy maker for the Harahan Police Department, an agency of the City of Harahan, engaged in a pattern of retaliation, false accusations, double standards, and harassment against officers who were not favored by Chief Walker and other authority figures in Chief Walker's administration. Rec. Doc. 11.  Plaintiff's Section 1983 First Amendment discrimination and retaliation claim against the City of Harahan relies on the same facts asserted in support of the Section 1983 First Amendment discrimination and retaliation claims against all other defendants in their individual capacities, with the addition of the allegation that Chief Walker was the final policymaker. *Id.*  Specifically, in plaintiff's First Amendment discrimination and retaliation claim against all other defendants, plaintiff alleges an unlawful pattern and practice at the HPD. *Id.* Plaintiff alleges that favoritism, misconduct, and retaliatory actions that have resulted in fifteen (15) officers, almost 75% of the force, either resigning or being fired over the last two years. Rec. Doc. 11 at ¶ 17. Plaintiff provides a summary of his allegations to indicate the defendants' policy or custom of favoritism and misconduct:

- The Plaintiff's superiors ordered him not to file the October 2018 discipline in Gremillion's personnel file because they were personal friends with Gremillion;
- The Plaintiff was placed on leave during the investigation of the "shots fired" incident while Gremillion was not;
- The Plaintiff was required to have a psychiatric evaluation during the investigation while Gremillion was not;
- Defendant Bronk was placed in charge of the "shots fired" investigation despite his personal friendship with Gremillion and predetermined belief that the Plaintiff had violated policy;
- The Plaintiff was terminated after the "shots fired" incident for allegedly writing a false report, but Captain Adams, who knew of the alleged discrepancy in the report, received no discipline and was never investigated even though he approved the report as written;
- The Plaintiff was terminated after the "shots fired" incident but Gremillion — whose statements on the scene had caused a citizen to be wrongfully charged with a serious crime — received no discipline and was in fact promoted;
- Officer David Louque, who was perceived to be supportive of the Plaintiff during the "shots fired" investigation, was terminated for bogus reasons, including the allegation that he engaged in conduct that Gremillion had engaged in on multiple occasions;
- Walker and Moody refused to hire Calvin Olivier, a reserve officer, because he was viewed as aligned with the Plaintiff;
- Like the Plaintiff, Officer David Darwin was terminated based on untrue accusations in retaliation for speaking up about misconduct at HPD;
- After the Plaintiff was reinstated by the Civil Service Board, Defendants Walker and Moody continued their pattern of harassing the Plaintiff in an attempt to get him to resign, including by filing bogus disciplinary charges against him which they then dismissed rather than attempt to defend them at a public hearing.

Rec. Doc. 17 at 17.

Further, he identified Walker as the policymaker for purposes of stating the *Monell* claim and noted that defendants did not dispute Walker's role as such. *Id.* at 18. Lastly, plaintiff asserts that defendants' custom of provoking favoritism, misconduct, and retaliatory acts served as "the moving force" behind the violations of his First Amendment rights. *Id.*

Furthermore, Lightell relies on *LeBeouf v. Manning*, wherein the Fifth Circuit reviewed the district court's grant of the defendant's motion to dismiss for failure to state a claim. 575 Fed.Appx. 374, 375 (5th Cir. 2014) (per curiam). In granting the defendant's 12(b)(6) motion, the lower court found that the facts did not plausibly suggest that the defendant had an improper motive in requiring the plaintiff to participate in a three-day inpatient psychiatric treatment. *Id.* at 378. However, the Fifth Circuit reversed the lower court's decision because "it is inappropriate to attribute a benign intent to [the defendant]" when deciding a Rule 12(b)(6) motion. *Id.*

Defendants argue that allegations provided by Lightell to evidence HPD's policy or custom are too conclusory and lack sufficient facts to withstand their motion to dismiss. Rec. Doc. 14-1 at 11. As such, defendants cite to the *Colle* case, in which the Fifth Circuit stated, "a plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity." *Colle v. Brazos County, Tex.*, 981 F.2d 237,

245 (5th Cir. 1993) (holding that the plaintiffs have adequately stated a claim against the defendants under Section 1983). Following this statement, the Fifth Circuit cited to *Oklahoma City v. Tuttle*, in which the Supreme Court held that jurors may not infer the existence of improper policies from a single unconstitutional act. *Id.* at n.39; *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427 (1985).

Unlike the issues raised in *Colle* and *Tuttle*, plaintiff has provided sufficient facts in his amended complaint that plausibly suggest a repeated practice of improper policies by the defendants beyond "some interaction" with Walker and HPD. Just as the defendants correctly state that a policy may not be inferred from an isolated interaction, their allegedly neutral intent to review plaintiff's job performance may likewise not be inferred when it is plausible they placed Lightell under greater and unjustified scrutiny post-reinstatement. As discussed throughout, plaintiff has asserted sufficient facts that make it plausible that defendants' alleged misconduct occurred more than as a mere isolated interaction. Therefore, the Rule 12(b)(6) motion to dismiss as it relates to the *Monell* claim is denied.

### d. <u>Federal Constructive Discharge Claim & Louisiana Constructive Discharge Claim</u>

To prove constructive discharge, a plaintiff must show that a "reasonable person in [his] shoes felt compelled to resign."

*Benningfield*, 157 F.3d at 378. "[A] constructive discharge claim requires a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." *Id.* In *Benningfield v. City of Houston*, the Fifth Circuit held that the plaintiff's fear of future retaliation was not sufficient to support her claim of constructive discharge. *Id.*

Establishing constructive discharge generally requires a plaintiff to show that his employer made his "working conditions so intolerable that a reasonable employee would feel compelled to resign." *See Finch v. Fort Bend Indep. Sch. Dist.,* 333 F.3d 555, 562 (5th Cir.2003). In other words, a plaintiff may be constructively discharged when she is placed "between the Scylla of voluntary resignation and the Charybdis of forced termination." *Fowler v. Carrollton Pub. Library,* 799 F.2d 976, 981 (5th Cir.1986) (relying on *Findeisen v. N.E. Indep. Sch. Dist.,* 749 F.2d 234 (5th Cir.1984) and *Bueno v. City of Donna,* 714 F.2d 484 (5th Cir.1983)). While the determination of whether a reasonable employee would feel compelled to resign depends on the facts of each case, we have observed that it can be shown where an employee is subjected to badgering, harassment, or humiliation calculated to encourage the employee to resign. *See Barrow v. New Orleans S.S. Ass'n,* 10 F.3d 292, 297 (5th Cir.1994). Further, "[c]onstructive discharge in a procedural due process case constitutes a § 1983 claim only if it amounts to forced discharge to avoid affording pretermination

hearing procedures." *Fowler,* 799 F.2d at 981; *see also Rutland v. Pepper,* 404 F.3d 921, 923 (5th Cir.2005).

In the instant case, plaintiff alleges defendants engaged in a campaign of harassment that resulted in his transfer to a less desirable position, the current job at the Jefferson Parish Sheriff's Office. Rec. Doc. 11 at ¶ 67. Plaintiff asserts the transfer involved a loss of rank and training status as well as a lower salary. *Id.* Plaintiff avers that defendants' harassment began with the investigation of the "shots fired" incident in which the defendants were set on making the plaintiff's working life as a police officer miserable and dangerous. Rec. Doc 17 at 24. Further, he asserts defendants required him to undergo a psychiatric evaluation for no reason and placed him on administrative leave unjustifiably. *Id.* Plaintiff cites to *LeBeouf v. Manning* in support of his argument that the request for him to undergo psychiatric evaluation is enough for constructive discharge. *See LeBeouf*, 575 F. App'x 374 (5th Cir. 2014).

In *LeBeouf*, the Fifth Circuit ruled that a former nurse's allegations were sufficient to state a § 1983 claim that the hospital's human resources director constructively discharged her from employment with the hospital without procedural due process of law, where the nurse alleged that the director informed her that if she did not resign or agree to immediate involuntary commitment to a three-day psychiatric hospitalization she would be

fired, and that the director failed to provide her with an explanation as to why she would be committed or why such commitment was necessary in light of the fact that she was not protesting a drug test or suspension. *Id.* The Fifth Circuit noted that commitment to a hospital for psychiatric care is a "massive curtailment of liberty" and that an objectively reasonable employee in LeBeouf's position could feel an intolerable working environment was created when informed that she would be immediately involuntarily committed to a three-day psychiatric hospitalization. *Id.*

Further, plaintiff alleges defendants' harassment became dangerous when Gremillion failed to respond when the plaintiff called for back-up while fighting with a violent subject. Rec. Doc. 17 at 24. Additionally, plaintiff alleges defendant Chief Walker unjustifiably terminated him based on the "shots fired" incident, promoted Gremillion and failed to discipline Captain Adams. *Id.* Plaintiff avers that following his successful appeal of his termination, Chief Walker and Assistant Chief Moody persisted with their harassment of plaintiff by constantly questioning his actions, undermining his authority with the officers he supervised, and filing false disciplinary charges against him, which they then dismissed rather than having to publicly defend the discipline. *Id.*

Defendants argue that the treatment alleged does not rise to

the level necessary to assert a constructive discharge claim. Rec. Doc. 14-1 at 16. They contend that while all of Plaintiff's factual allegations must be accepted as true, plaintiff's conclusion that the allegations constitute harassment does not have to be taken as true. *Id.* Defendants argue that it is not unreasonable for plaintiff's superior officers to question plaintiff about his decisions that are relevant to his job performance and his ability to competently serve as a police officer. *Id.* Further, defendants argue it is unclear how Chief Walker's dismissal of plaintiff's suspension constitutes harassment. *Id.*

For a resignation to constitute constructive discharge, an employer's actions must make conditions so intolerable that the reasonable employee would feel compelled to resign. *Shawgo v. Spradlin*, 701 F.2d 470, 481 (5th Cir. 1983) (finding that the plaintiff's resignation following his demotion resulted from his own personal reaction to his demotion and was not constructive discharge); *Kelleher v. Flawn*, 761 F.2d 1079, 1086 (5th Cir. 1985) (finding that change in teacher's duties was not so intolerable).

Plaintiff asserts that he felt compelled to resign because he was "exhausted and demoralized" by the harassment and he feared he would be disciplined and put under investigation in the future without cause. Rec. Doc. 11 at 19 ¶65. As evidence that termination would adversely affect his ability to secure employment at another police department, plaintiff cites to S*wear v. Lawson* in which the

41

court determined whether interference with future employment opportunities constitutes conditions so intolerable that a reasonable employee would feel compelled to resign requires a factual determination. S*wear v. Lawson*, 288 F. Supp. 3d 669, 695-96 (E.D.La. 2018) (Brown, J.)

Whether or not the actions of defendants, including alleged reprimands against plaintiff were of a "greater severity or pervasiveness of harassment" than that of a hostile work environment is a question of material fact. *Id.* Viewing the facts and drawing all inferences in the light most favorable to plaintiff, we are compelled to conclude that the complaint plausibly establishes a constructive discharge claim. *Finch,* 333 F.3d at 562; *Fowler,* 799 F.2d at 981.

Pursuant to Louisiana law, the inquiry into a constructive discharge claim is case-and-fact specific, and the relevant factors which may be present singularly or in combination include:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger (or less experienced/qualified) supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement (or continued employment on terms less favorable than the employee's former status).

*Robinson v. Bd. of Supervisors for Univ. of Louisiana Sys.,* 2016-2145 (La. 6/29/17), 225 So. 3d 424, 431. Because Louisiana courts consider similar factors as federal claims for constructive

discharge, the plaintiff's constructive discharge claim brought pursuant to Louisiana law is also plausibly established.

   e. **Due Process Claim**

   The Due Process Clause of the Fourteenth Amendment forbids any State from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV, § 1. This provision requires that the government give an "opportunity to be heard 'at a meaningful time and in a meaningful manner'" before depriving any person of "life, liberty, or property." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

   When an employee's "good name, reputation, honor or integrity is at stake due to an action by the government, he is entitled to notice and an opportunity to be heard." *Sims v. City of Madisonville*, 894 F.3d 632, 642 (5th Cir. 2018) (citing *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). But an employee's constitutionally protected liberty interest "'is implicated only if [he] is discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities.'" *Sims*, 894 F.3d at 642 (quoting *White v. Thomas*, 660 F.2d 680, 684 (5th Cir. 1981)). The proper defendant in a deprivation-of-liberty suit is the government employer — not a government employee or

official. *Sims*, 894 F.3d at 642 (citing *Harris v. City of Balch Springs*, 9 F. Supp. 3d 690, 700 (N.D. Tex. 2014)).

It is undisputed that plaintiff is a classified civil service employee with permanent status who has a property interest in his position and therefore is entitled to due process protection. *See Lange v. Orleans Levee Dist.,* 56 So.3d 925, 930 (La.2010) (observing that a permanent, classified civil service employee has a property interest in her job and cannot be terminated without due process of law); *see also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 545-46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (explaining that procedural due process requires notice and an opportunity to respond before one can be deprived of a protected property interest). However, the parties disagree as to whether the complaint demonstrates that the plaintiff was constructively discharged. As explained above, plaintiff's complaint plausibly shows a constructive discharge claim. An employer who causes a constructive discharge is liable for failing to provide the due process protections that the employee would have received if he was formally discharged. *See Jurgens v. EEOC,* 903 F.2d 386, 390 (5th Cir.1990). Accordingly, the complaint plausibly establishes a due process claim.

However, plaintiff's claims against the officers fail as a matter of law because "[a] deprivation of liberty claim lies

against the government employer, not a government employee or official." *Sims*, 894 F.3d at 642 (citing *Harris*, 9 F. Supp. 3d at 700). Accordingly, we grant the Harahan defendants' motion to dismiss procedural due process claims that Plaintiff may be asserting against all defendants except the City of Harahan. Because any such claims against the officers are deficient as a matter of law, amendment would be futile.

Although the plaintiff addresses a substantive due process claim, the defendants do not address the claim in its motion to dismiss. Therefore, the Court will not give an analysis of Plaintiff's substantive due process claim since the defendant does not expressly request that Plaintiff's claim be dismissed. *See Wayne v. City of San Antonio*, No. SA-06-CV-551-XR, 2006 WL 3487022, at *2 (W.D.Tex. Nov. 30, 2006)(because defendant did not separately address plaintiff's section 1983 claim in his motion to dismiss, the court neither dismissed the claim nor addressed the claim's merits in its order); *see also Bowman v. Collier*, 2021 WL 818385, at *2, n. 1 (E.D.Tex. Jan. 19, 2021)(treating defendants' motion to dismiss as a motion for partial dismissal because their motion did not address plaintiff's claims under the First and Fourteenth Amendments).

  f. **State Due Process Claim**

Louisiana Revised Statute § 40:2531 provides procedures for conducting administrative investigations of police officers. La.

45

Stat. Ann. § 40:2531. Whenever a police employee or law enforcement officer is under investigation, the statute provides the minimum standards that shall apply. *Id.* There shall be no discipline, demotion, dismissal, or adverse action of any sort taken against a police employee or law enforcement officer unless the investigation is conducted in accordance with the minimum standards provided for in this Section. Any discipline, demotion, dismissal, or adverse action of any sort whatsoever taken against a police employee or law enforcement officer without complete compliance with the foregoing minimum standards is an absolute nullity. *Id.*

The amended complaint alleges that the defendants violated La. R.S. 40:2531. It does not give specific details under the claim for "State Constitutional Law" as the complaint only states, "Defendants violated his right to due process under the State Constitution when they constructively discharged him from his employment through a pattern of retaliatory harassment." Rec. Doc. 11 at 22 ¶87. Plaintiff's factual allegations cite two disciplinary actions imposed on him by HPD, the original termination in April 2019 and the suspension in July 2019. *See id.* However, plaintiff alleges no specific facts in the amended complaint as to how the minimal standards were not met. "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements' cannot establish facial plausibility." *SnoWizard,*

*Inc.*, 833 F.3d at 520 (quoting *Iqbal*, 556 U.S. at 678. Therefore, the plaintiff's state due process claim is hereby dismissed.

 **g. <u>Defamation Claim</u>**

 In Louisiana, "defamation is a tort involving the invasion of a person's interest in his or her reputation and good name." *Kennedy v. Sheriff of East Baton Rouge*, 2005-1418, p. 5 (La. 7/10/06); 935 So. 2d 669, 674. It consists of four elements: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Costello v. Hardy*, 2003-1146, p. 12 (La. 1/21/04); 864 So. 2d 129, 139 (citation omitted). Fault within defamation "is generally referred to in the jurisprudence as malice, actual or implied." *Id*. In *Kennedy*, the court stated:

> In Louisiana, defamatory words have traditionally been divided into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning. Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, without considering extrinsic facts or circumstances, are considered defamatory per se. When a plaintiff proves publication of words that are defamatory per se, falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Injury may also be presumed. When the words at issue are not defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, falsity, malice (or fault) and injury.

*Kennedy*, 935 So.2d 674-75 (citing *Costello*, 864 So.2d at 140) (internal citations omitted).

Plaintiff alleges defendants repeatedly defamed his reputation as a police officer by making false accusations against him. Rec. Doc. 11 at 22 ¶82. More specifically, he alleges that Chief Walker made statements to the Jefferson Parish District Attorney that plaintiff was "found to be untruthful." Rec. Doc. 11 at 11 ¶36. However, Plaintiff's argument that Chief Walker's statements could be construed as falsely accusing him of the crime of perjury or falsifying a police report is without factual support. Considering the facts of the plaintiff's amended complaint in the light most favorable to the plaintiff, he has not alleged factual support for that conclusion. Plaintiff's amended complaint offers only conclusions that "[t]he Defendants repeatedly defamed the Plaintiff's reputation as a police officer by making false accusations against him. This pattern of defamation contributed to the constructive discharge of the Plaintiff." *Id.* at 22 ¶ 82. Plaintiff must allege specific facts to support the legal conclusions that litter his complaint relative to defamation. See *Iqbal*, 556 U.S. at 678. Because he fails to do so, the defamation claim is hereby dismissed.

### h. **Louisiana Whistleblower Claim**

The Louisiana Whistleblower statute provides certain protections to employees who disclose or threaten to disclose an employer's unlawful activity:

A. An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
(1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
(2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
(3) Objects to or refuses to participate in an employment act or practice that is in violation of law.

La. R.S. § 23:967(A)(1-3). In *Crowe v. Se. Cmty. Health Sys.,* the court explained:

Louisiana courts state that the statute targets serious employer conduct that violates the law. And it offers protection only to those employees who face reprisals from their employers based solely upon an employee's *knowledge* of an illegal workplace practice and his refusal to participate in the practice or intention to report it. The plaintiff bears the burden of proof in making a claim under the whistleblower statute. Because Plaintiff has the burden of proof as to this claim, Defendant need not negate the claim but, as stated above, must show the Plaintiff lacks evidence sufficient to enable it to survive a motion for directed verdict at trial.

*Crowe v. Se. Cmty. Health Sys.,* No. CIV.A. 10-2838, 2014 WL 1456352, at *6 (E.D. La. Apr. 15, 2014) (Duval, J.) (internal quotes and citations omitted).

Louisiana courts have interpreted the statute as requiring certain elements. *See, e.g., Krielow v. R & H Supply, Inc.,* 123 So.3d 1235, 1239 (La.App. 3 Cir. 10/9/13); *Hale v. Touro Infirmary,* 886 So.2d 1210, 1215 (La.App. 4 Cir. 11/3/04), *writ denied,* 896 So.2d 1036 (La.3/24/05). While the Louisiana Supreme Court has not directly addressed whether a plaintiff must prove an

actual violation of state law, the appellate courts have
consistently determined that the statute requires proof of an
actual violation. *See, e.g., Accardo v. Louisiana Health Servs. &
Indem. Co.,* 943 So.2d 381, 383 (La.App. 1 Cir. 6/21/06); *Hale v.
Touro Infirmary,* 886 So.2d 1210 (La.App. 4 Cir. 11/3/04), *writ
denied,* 896 So.2d 1036 (La.3/24/05); *Goldsby v. State, Dep't of
Corr.,* 861 So.2d 236 (La.App. 1 Cir. 11/7/03), *writ denied,* 0328
870 So.2d 271 (La.4/8/04), and *writ denied,* 870 So.2d 271
(La.4/8/04). Therefore, as part of the plaintiff's *prima facie*
case, "the plaintiff must prove an actual violation of a state
law, not just a good faith belief that a law was broken." *Mabry v.
Andrus,* 34 So.3d 1075, 1081 (La.App. 2 Cir. 4/14/10), *writ
denied,* 45 So.3d 1079 (La.9/24/10) (citations omitted). "Moreover,
the employee must first 'advis[e] the employer of the violation of
law' before the statutory remedies take effect." *Id.* (citation
omitted); *see Fondren,* 871 So.2d at 691.

Accordingly, plaintiff must prove that: (1) HPD violated the
law through a prohibited workplace act or practice; (2) Plaintiff
advised HPD of the practice; (3) Plaintiff then refused to
participate in the prohibited practice or threatened to disclose
the practice; and (4) Plaintiff was fired as a result of his
refusal to participate in or threat to disclose the
practice. *See Hale,* 886 So.2d at 1216.

Plaintiff alleges (1) that the HPD mishandled evidence and

HPD property, falsified reports, and implemented a quota system; (2) that in a meeting on March 18, 2019 Plaintiff advised Chief Walker and Asst. Chief Moody of the quota system and other violations; (3) that Plaintiff told Chief Walker and Asst. Chief Moody he refused to participate in the illegal practices; and that (4) Plaintiff was constructively discharged from HPD as reprisal for these actions. Rec. Doc. 17 at 31. Plaintiff also alleges he reported the practices to a special agent of the FBI on March 20, 2019. Rec. Doc. 11 at 10 ¶ 34. As further support of his claim, he alleges that during the March 18, 2019 meeting, Chief Walker told plaintiff that he "did not need him working as a Sergeant if he could not make his officers write tickets." *Id.*

Viewing the facts and drawing all inferences in the light most favorable to plaintiff, the complaint has raised a plausible claim pursuant to the Louisiana Whistleblower statute.

### i. <u>Respondeat Superior</u>

Lastly, we will address whether it is proper to apply the doctrine of *respondeat superior* to plaintiff's claims. As noted by the defendants, the Supreme Court stated in *Monell*:

> . . .the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

51

*Monell*, 436 at 691. Defendant states and plaintiff concedes that the plaintiff may not apply the theory of *respondeat superior* to his claims under § 1983, but they dispute whether it may be applied to his state claims. Rec. Doc. 14-1 at 24; Rec. Doc. 17 at 33.

Defendants rely on the Louisiana Fifth Circuit Court of Appeal's decision in *Stein*, wherein the plaintiff-patient sought to have the court apply *respondeat superior* against the City of Gretna for failure to train its EMTs employees. *Stein v. City of Gretna*, 17-554 (La. App. 5 Cir. 5/30/18), 250 So.3d 330. The court declined to apply the doctrine in that case because the plaintiff failed to prove that the city was required to train or supervise its employees on the use of seatbelts by EMTs. *Id.* at 337.

Defendants assert that the theory should likewise not be applied in the present case because there is no fault of the individual defendants that can be imputed to the City of Harahan. Rec. Doc. 14-1 at 24. However, as stated above, plaintiff has set forth factual allegations under Louisiana law that would permit applying *respondeat superior* to those respective state claims. Therefore, defendants' argument that *respondeat superior* is inapplicable to instant claims under state law fails. Subject to further review after discovery, summary judgment motion, or at trial, dismissal at this stage is premature to consider under Federal Rule of Civil Procedure 12(b).

New Orleans, Louisiana this 18th day of March 2021

SENIOR UNITED STATES DISTRICT JUDGE